# Chicago & Alton Railway Company, Defendant in Error, v. L. E. Slick & Company et al. Lee Rust, Plaintiff in Error.

1. INDEMNITY, § 21*—*when defense of estoppel is not available.* The principle of equitable estoppel had no application in favor of the surety on a bond given to the plaintiff railroad company to insure it against loss by reason of the surrender of bills of lading to the principal in the bond without paying for the shipment, where the only defense was that an agent of plaintiff had stated to defendant on a day named that there were no bills of lading upon which deliveries had been made, when in fact there were two with sight drafts attached that had not been settled for and which plaintiff was liable for under the bond, and where there was dispute as to what the agent did say, and in any event there was no showing of any injury to plaintiff.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number,

2. ESTOPPEL, § 42*—*what is essential to give rise to estoppel.* No equitable estoppel arises in favor of a surety from a misstatement of facts as to liability unless such surety is shown to have suffered by reason thereof.

Error to the Circuit Court of McLean county; the Hon. SAIN WELTY, Judge, presiding. Heard in this court at the April term, 1920. Affirmed. Opinion filed October 27, 1920.

STONE & DICK, for plaintiff in error. .

BRACKEN & YOUNG and W. B. LEACH, for defendant in error; SILAS H. STRAWN, of counsel.

MR. JUSTICE GRAVES delivered the opinion of the court.

L. E. Slick & Company were in the grain, flour and feed business at Bloomington. Defendant in error is a common carrier having a line of road running through that place. Some of the goods purchased by Slick & Company in carload lots were shipped to them over the lines of defendant in error. When goods were consigned to it in carload lots over the lines of defendant in error, it was supposed to hold the same until the bill of lading for such car was surrendered. Some of the shippers had the habit of attaching a sight draft to the bill of lading and sending the two to a bank, the bank to hold the bill of lading until the sight draft was paid. When that was done, the bill of lading was delivered to Slick & Company, consignee, who in turn delivered it to defendant in error and the carload of goods was surrendered to Slick & Company. Sometimes it was desirable to have the goods turned over without the surrender of the bill of lading. That course would render the railroad company liable to the shipper for the value of the shipment in case Slick & Company did not pay for the same. In order to protect the railroad company from loss in case a load of goods so delivered was not paid for by Slick & Company, that company gave to it a bond conditioned that

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Slick & Company should hold the railroad harmless in case a carload of goods should be delivered to them without the surrender of the bill of lading. This bond was by its terms to cover all such deliveries up to July 1, 1918. L. E. Slick and plaintiff in error, Lee Rust, signed this bond as sureties. In the month of June, 1918 two cars of goods came over the lines of defendant in error and were delivered to Slick & Company without the surrender of the bill of lading. These two carloads of goods were not paid for by Slick & Company although sight drafts were sent with the bills of lading and were presented to Slick & Company in due course. One of these carloads of goods was billed at $3,500 and was delivered on June 10, 1918, and the other, billed at $4,284, was delivered on June 24, 1918. Defendant in error began this suit on the bond to recover for the amount of the two sight drafts mentioned, and recovered judgment thereon for $8,250.07.

The only defense interposed by plaintiff in error to this suit was that of equitable estoppel. He insists that one Murray, the agent of defendant in error, told him on July 6 or 7, 1918, that there were no bills of lading upon which deliveries had been made for which plaintiff in error was liable, and that there was no further liability on the bond, when in fact there were two bills of lading with sight drafts attached that had not been settled for, and for which plaintiff in error was by the terms of his bond liable. It was on those two bills of lading that the judgment sought to be reversed was based.

Plaintiff in error claims that when the statement referred to was made by Murray, he, plaintiff in error, was in a position, if he had known the real facts, to have protected himself from loss by reason of the fact that at that time and for a few days thereafter there was in his bank a sufficient sum of money belonging to L. E. Slick & Company, subject to check, to more than cover the amount of the two sight drafts in question.

Murray denies telling plaintiff in error that there were no outstanding bills of lading for which he was liable, but says he told him he did not "find any." He also denies telling him anything about being released from liability. It is conceded that the only contest between plaintiff in error·Rust and defendant in error in this suit is upon the question of discharge of plaintiff in error from liability by reason of the statements claimed to have been made by Murray above referred to. It is not claimed that those statements were wilfully untrue or corruptly made.

The proof in the record strongly tends to show that between June 24, 1918 and July 23, 1918, plaintiff in error had several conversations in regard to these particular bills of lading with persons in charge of the office of Slick & Company, and knew of the fact that the sight drafts accompanying those bills of lading were outstanding; that one of those sight drafts was held by the bank of which he was cashier; that in one of those conversations plaintiff in error told L. E. Slick that Murray, the agent of defendant in error, had said that all of the bills of lading of the Chicago & Alton had been taken up; that both Mr. Slick and Walter Rust, the son of plaintiff in error, then told him there were two or three of such bills still unpaid. If this claimed conversation between plaintiff in error and Murray took place at all, which Murray denies, it occurred just before the time it was repeated by plaintiff in error to Slick as stated above; and that a day or two later plaintiff in error was again at the office of Slick & Company and was shown a memorandum slip of outstanding bills of lading which included the two for which judgment in this case was rendered.

It follows that even if Murray did tell plaintiff in error there were no unpaid bills of Slick & Company for which he was liable under his bond, plaintiff in error received notice from Slick & Company practically at once thereafter, and before the circumstances under

which he claims he was in a position to protect himself had changed, that such statement was not true.

The record fails to show that even if plaintiff in error was misinformed as to outstanding claims, he was in any way injured thereby. No equitable estoppel arises from a misstatement of facts as to liability unless the surety is shown to have suffered by reason thereof. *Flower v. Elwood,* 66 Ill. 438. In the case of *People v. Brown,* 67 Ill. 435, the Supreme Court has gone even further. In that case, speaking of the question of equitable estoppel, the court says: "The doctrine on this subject we understand to be, that, when a person, by his words or conduct, voluntarily causes another to believe in the existence of a certain state of things and induces him to act upon that belief, so as to change his previous position, he will be estopped to aver against the latter a different state of things. Text-writers denominate this estoppel by conduct, in order to which *all* of the following elements must be present: (1) There must have been a representation concerning material facts. (2) The representation must have been made with knowledge of the facts. (3) The party to whom it was made must have been ignorant of the truth of the matter. (4) It must have been made with the intention it should be acted upon. (5) It must have been acted upon. In this connection, it is said, the representation here spoken of is one external to, and not necessarily implied in, the transaction itself, and fraud, or something tantamount thereto, is now the distinctive character of this kind of estoppel. Bigelow on Estoppel, introduction, p. 60."

In the case at bar, the representations made by Murray, if they were made, are not shown to have been made with a knowledge of the facts, nor is there anything in this record to show that plaintiff in error acted to his detriment upon any information he claims to have received from Murray.

In the case of *Holcomb v. Boynton,* 151 Ill. 294, the court says: "As we understand the doctrine of estoppel

*in pais,* it is based upon a fraudulent purpose and a fraudulent result.   *   *   *   The essential elements are: misrepresentation or concealment of material facts, ignorance of the truth of the matter by the party to whom the representations were made, and reliance upon his part in acting upon the representations." In *Knapp v. Jones,* 143 Ill. 375, the court quotes with approval from *Davidson v. Young,* 38 Ill. 152, the following: "If the element of fraud is wanting, there is no estoppel, as, if both parties were equally cognizant of the facts, and the declaration or silence of the one party produced no change in the conduct of the other, he acting solely upon his own judgment. There must be deception, and change of conduct in consequence, in order to estop a party from showing the truth." The facts disclosed by the evidence in this record do not constitute an equitable estoppel.

Plaintiff in error complains that the court refused several instructions requested by him. The number of instructions offered by each side was inexcusably large; plaintiff in error handed up twenty-two instructions, one of them covering four pages of typewriting, in itself quite an exhaustive treatise on the law of estoppel, and defendant in error handed up twenty-three. In this case, where it is conceded the only question in controversy was whether the facts showed an equitable estoppel, the court would have been justified in refusing to consider any of these instructions and in requiring counsel to sort out and withdraw half of them and return the balance for the court's consideration. The practice of each party to a suit drawing up and handing to the court to be culled out a lot of inconsistent instructions on each side of some phase of every issue involved in the case so that whichever instruction is given by the court, one presented by the same party containing a contradictory and conflicting theory and statement must be refused, is wholly unwarranted and should not be tolerated. This screed is only mildly applicable to the case at bar, but is the

culmination of the composite experiences of years which the writer feels impelled to record. In this case, plaintiff in error handed to the court, with the request that they be marked "given," instructions covering two theories of the law of equitable estoppel: one of those theories was that if one secured by a bond or obligation induces a surety thereon to believe that such surety is released and discharged from any further liability thereon, and was thereby lulled into security and induced to refrain from taking, or was caused to fail to take, such steps as might have protected him from loss, then such surety is discharged from liability to the extent he has been damnified by the course he has been so induced to pursue. Two instructions presented by plaintiff in error embodying this theory were given by the court as tendered. Other instructions were tendered by him announcing in varying verbiage the law to be that if a surety was so lulled into security and caused to refrain from taking steps to protect himself against loss, then the obligee would be estopped from suing on the obligation regardless of whether the surety was damnified thereby or not. These the court refused.

Where a party induces the court to give to the jury an instruction on one theory of the law, he cannot complain that the court refused to give other instructions asked by him announcing a contrary and conflicting theory.

Other complaints are made for the giving and refusing of other instructions, but they are without merit.

There was a plea of the general issue filed by L. E. Slick & Company, a codefendant with plaintiff in error in this case, and was part of the files at the time of the trial. That plea put defendant in error to his proof. It appears from the abstract that after such proof was introduced plaintiff in error Rust for the first time claimed the opening and close of the case, on the theory that the only contested issue in the case was that made

on the plea of estoppel filed by him. The fact that there was an issue in the case that required defendant in error to introduce proof, although it was formal and was made on the plea of a codefendant of plaintiff in error, was sufficient to give to defendant in error the right to the opening and close of the case. *McReynolds v. Burlington & O. River Ry. Co.*, 106 Ill. 152. Counsel for plaintiff in error suggest that while it does not appear in the abstract, the fact is and the record will show that their claim to the right of opening and closing the case was made before any evidence was introduced. A party seeking the reversal of a judgment for error must show by his abstract of the record all the things necessary to disclose the error complained of. A court of review will search the record for reasons to affirm a judgment but will never do so to find reasons for reversing it.

While Walter Rust, a son of plaintiff in error, was on the stand and was being interrogated in reference to certain drafts and memoranda in an attempt to identify them and render them admissible in evidence, many objections were interposed by plaintiff in error, some of which were overruled. Some of the answers of the witness made to some of the questions that were objected to were afterwards excluded from the consideration of the jury. We are unable to see any reversible error in the rulings of the court or how any inference adverse to plaintiff in error could have been drawn by the jury from it or any influence exerted over them by it to the detriment of plaintiff in error. The judgment of the circuit court is affirmed.

*Judgment affirmed.*